IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KELLY MOBERG                                               PLAINTIFF

          v.            Civil No. 12-5081

PHILLIPS ELECTRONICS NORTH AMERICA
CORPORATION GROUP WELFARE BENEFIT
PLAN and PHILLIPS ELECTRONICS NORTH
AMERICA CORPORATION                                      DEFENDANTS

## MEMORANDUM OPINION

Now on this 15th day of November, 2013, comes on for consideration plaintiff Kelly Moberg's appeal of the denial of long term disability benefits under an employee welfare benefits plan sponsored by her employer Philips[1] Electronics North America Corporation ("Philips").

The parties agree that Moberg has exhausted her administrative remedies, and that jurisdiction and venue are proper in this Court.

1. While employed by Philips, Moberg was a participant in the Philips Long Term Disability Plan (the "Plan"). She was placed on short term disability ("STD") in September, 2007. Eventually Moberg transitioned from STD benefits to long term disability ("LTD") benefits, and LTD benefits were paid from March 11, 2008, until March 10, 2010. However, because the Plan covers neuro-musculoskeletal disorders only for 24 months -- subject to

---

[1] The Court will identify this defendant by the spelling of its name that it indicates is correct in its Brief.

certain exceptions -- and because Moberg was considered disabled due to "degeneration, lumbar intervertebral disc," Moberg's LTD benefits were terminated as of March 10, 2010.

Moberg exhausted administrative appeals of the decision to terminate her LTD benefits.  The decision was upheld, and this judicial appeal followed.

2.   Judicial review of an administrative denial of ERISA benefits utilizes "a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." **Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).**  If the administrator has discretionary authority, its eligibility decisions are reviewed for abuse of that discretion. **Groves v. Metropolitan Life Ins. Co., 438 F.3d 872 (8th Cir. 2006).**

Moberg contends that *de novo* review is appropriate, while defendants claim that discretionary review is appropriate.

3.   The Administrative Record ("AR") contains a Certificate of Insurance (the "Certificate") setting out the terms under which Metropolitan Life Insurance Company insures the Plan.  The Certificate provides that "the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of

the Plan."

The AR also contains a Summary Plan Description ("SPD"), which provides that Philips is responsible for operation of the Plan; that Philips has designated the ERISA Administration Committee as the named fiduciary of the Plan; and that the ERISA Administration Committee has designated MetLife Disability Unit ("MetLife") as claims administrator to handle payment of claims. The SPD, which is a part of ERISA "plan documents," **Jobe v. Medical Life Ins. Co.**, 598 F.3d 478, 481 (8th Cir. 2010), gives MetLife "absolute discretion . . . to determine eligibility for and entitlement to plan benefits. . . ."

Given these provisions, the Court finds that the administrative decision in this case is subject to review for abuse of discretion.

4.    The abuse of discretion standard for ERISA review has been described as follows:

> In applying an abuse of discretion standard, we must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.  A reasonable decision is fact based and supported by substantial evidence.  We may consider both the quantity and quality of evidence before a plan administrator.  And we should be hesitant to interfere with the administration of an ERISA plan.

**Groves**, 438 F.3d 872, 875 (internal citations and quotation marks omitted).

"Substantial evidence" is "more than a scintilla but less

than a preponderance." **Leonard v. Southwestern Bell Corp. Disability Income Plan**, 341 F.3d 696, 701 (8th Cir. 2003).

Although abuse of discretion review puts a heavy burden on a participant whose benefits have been terminated, it does not amount to "rubber-stamping the result." A termination decision must be reasonable, i.e., "supported by substantial evidence that is assessed by its quantity and quality." **Torres v. UNUM Life Ins. Co. of America**, 405 F.3d 670, 680 (8th Cir. 2005).

5. Moberg's appeal was denied by a letter from Christine Dewey, dated 9/28/10, not because of improvement in the condition which had resulted in her being considered disabled, but due to a limitation in the Plan. After 24 months of benefits, the Plan excludes disability relating to:

> Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:
> a. seropositive arthritis;
> b. spinal tumors, malignancy, or vascular malformations;
> c. radiculopathies;
> d. traumatic spinal cord necrosis; or
> f. musculopathies.

The Certificate defines these conditions as follows:

*    "Spinal" refers to "[c]omponents of the bony spine or spinal cord."

*    "Tumors" are "[a]bnormal growths which may be malignant or benign."

* "Vascular Malformations" means "[a]bnormal development of blood vessels."

* "Radiculopathies" means "[d]isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology."

* "Myelopathies" means "[d]isease of the spinal cord supported by objective clinical findings of spinal cord pathology."

* "Musculopathies" means "[d]isease of muscle fibers, supported by pathological findings on biopsy or electromyography (EMG)."

Dewey's letter informed Moberg that while "[t]here had been symptoms reported that have been consistent with cervical radiculopathy, . . . there were no examination findings consistent with lumbar or cervical radiculopathy." Moberg's appeal was denied.

6.  Moberg then retained an attorney, who again appealed the termination of her LTD benefits.  On August 3, 2011, Evelyn Murphy, MetLife Appeals Specialist, wrote to Moberg's attorney, stating that "[t]he medical documentation does not support that Ms. Moberg has objective evidence of any of the exclusions to the limited benefit condition, such as seropositive arthritis, spinal tumors, malignancy, or vascular malformation, radiculopathies, myelopathies, traumatic spinal cord necrosis and musculopathies

beyong March 10, 2011 and continuing."

7.    In this appeal, Moberg contends that the 24-month limitation does not apply to her at all, but that if it does, her medical records contain objective evidence of spinal tumors, vascular malformations, radiculopathies, and musculopathies.

The Plan disputes all these contentions.

8.    Moberg's contention that the 24-month limitation does not apply at all is without merit.    She contends that the limitation applies only to soft tissue conditions, not conditions affecting the spine itself, but the limitation clearly states that it does apply to "any disease or disorder of the spine."

The only support that might exist for Moberg's argument is that the limitation is stated somewhat differently in the SPD, as it does not include the phrase "any disease or disorder of the spine."  It reads as follows:

> LTD benefits for disabilities resulting from neuro-musculoskeletal and soft tissue disorder are payable for up to a combined lifetime maximum of 24 months during all disability periods, unless the disability has evidence of:
> *    Seropositive arthritis
> *    Spinal tumors, malignancy, or vascular malformation
> *    Radiculopathus [sic]
> *    Myelopathies
> *    Traumatic spinal cord necrosis
> *    Musculopathies.

None of the listed terms is defined in the SPD, nor is the key word "neuro-musculoskeletal" defined in the SPD or the Certificate.    The Court turns, therefore, to the medical

-6-

dictionary in its library, **Stedman's Medical Dictionary**, **28th Ed.** While **Stedman's** does not define "neuro-musculoskeletal, it does define "neuromuscular" and "musculoskeletal." "Neuromuscular" is defined as "[r]eferring to the relationship between nerve and muscle, in particular to the motor innervation of skeletal muscles and its pathology." "Musculoskeletal" is defined as "[r]elating to muscles and to the skeleton."

**Stedman's** also indicates that "neur" and its forms "neuri" and "neuro" -- meaning "[n]erve, nerve tissue, the nervous system" -- are "building blocks of medical language," *i.e.*, "prefixes, suffixes, and combining forms that make up 90 to 95 percent of medical vocabulary."

Given these definitions, the Court finds that "neuro-musculoskeletal" refers to not only nerves and muscles but also the skeleton, and that, of course, includes the spine.

9.   Moberg's contentions with regard to myelopathies, spinal tumors, and vascular malformations are likewise without merit.

"Myelopathies" is defined in the Certificate as "[d]isease of the spinal cord supported by objective clinical findings of spinal cord pathology." The Court's review of the AR reflects no diagnosis of myelopathy, nor anything shown by the evidence to be considered "objective clinical findings of spinal cord pathology."

Moberg's argument on this issue appears to conflate "spinal cord"[2] with "spinal column" or, more generally, "spine." Nothing in the AR suggests that a herniated or ruptured intervertebral disc amounts to a disease of the spinal cord itself.

"Tumors" are defined as "[a]bnormal growths which may be malignant or benign." Moberg contends that a diagnosis of possible osseous hemangiomas[3] on an MRI done 9/3/09 would bring her within this exception. She also contends that bone spurs are abnormal growths; that she has been diagnosed with spondylosis; and that spondylosis can manifest itself as "abnormal growths or 'spurs' on the spine."

"Vascular Malformations" are "[a]bnormal development of blood vessels," and Moberg contends that suspected Tarlov cysts[4] found during the 9/3/09 MRI would bring her within this exception.

These arguments are all based on speculation -- either about whether the condition exists or about whether it is causing symptoms -- and as such are without merit.

10. The real issue is Moberg's contention that she suffers from radiculopathies that take her case out of the 24-month limitation. There is no question that Moberg's physicians

---

[2] As defined in www.medilexicon.com, the spinal cord is "the elongated cylindric portion of the cerebrospinal axis, or central nervous system, which is contained in the spinal or vertebral canal."

[3] A benign tumor of the spine, according to the American Academy of Orthopedic Surgeons, cited at AR 936.

[4] A "perineural cyst found in the proximal radicles of the lower spinal cord." **Stedman's Medical Dictionary, 28th Ed.**

repeatedly diagnosed her as suffering from radiculopathies, but the issue on appeal is whether there are "objective clinical findings of nerve root pathology" to support that diagnosis. "Objective" means "open to observation by oneself *and by others*," as opposed to a symptom such as pain which can be observed only by the patient and is, therefore, considered "subjective." **Stedman's Medical Dictionary**, **28th Ed.** (Emphasis added.)

Unfortunately, neither party has set out in any clear fashion what constitutes "objective clinical findings of nerve root pathology."[5] The Court has, therefore, turned to case law interpreting similar limitations in other MetLife ERISA plans for guidance on this issue. This is important because Moberg's physicians were tasked with diagnosing Moberg's problems, not with couching that diagnosis in the terminology of the Certificate.

In **Brien v. Metropolitan Life Ins. Co.**, **2012 WL 4370677 (D.Mass. 2012)**, the witnesses discussed electrodiagnostic testing, such as nerve conduction studies, as a means of objectively documenting the existence of radiculopathy. Physical findings of radiculopathy that might be made by a physician on examination included muscle atrophy, loss of muscle tone or strength, abnormal motor or sensory findings, and abnormal reflexes.

---

[5] Moberg offered MetLife data from the American Academy of Orthopedic Surgeons as to *causes* of radiculopathy, including an explanation as to how degenerative disc disease and bone spurs might contribute (AR 928, 930, 937), but causes are not the same as clinical findings. It is possible that one might have degenerative disc disease without having radiculopathy.

From statements by a medical witness in **Marden v. Metropolitan Life Ins. Co.**, **2012 WL 2020931, \*5 (D.N.D., 2012)**, it appears that an MRI study constitutes objective evidence of radiculopathy if it shows neural foraminal encroachment or nerve root compression.

11. The Court has examined the medical records in the AR to determine what evidence exists in the aforementioned categories of objective evidence of radiculopathy. Because such evidence must have existed on or about the date benefits were terminated to be relevant, the Court has elected to review records from one year before and one year after the termination date of March 10, 2010. The Court does not here summarize those records in their entirety, but only those portions relating to electrodiagnostic testing; physical findings of muscle atrophy, loss of muscle tone or strength, abnormal motor or sensory findings, and abnormal reflexes; and MRI studies as they relate to neural foraminal encroachment or nerve root compression.

\*    On 07/14/09, Dr. Gannon Randolph, one of Moberg's treating orthopedists, examined Moberg and reported "a little bit of weakness in her left upper extremity [and] in her ulnar 2 digits as well," and "slight decrease in sensation of her ulnar 2 digits in the ulnar nerve distribution," but "no thenar[6] or

---

[6] "Term applied to any structure in relation with the base of the thumb or its underlying collective components." Stedman's Medical Dictionary, 28th Ed.

-10-

hypothenar wasting of her left arm." He found "intact light touch sensation T-12 to S-2," and "5/5 muscle strength in all major muscle groups bilateral lower extremities. He reported normal Babinski[7] sign.

     *    On 7/20/09, Moberg had an EMG[8] of the left arm which was reported as "[n]ormal electrodiagnostic study of the left upper extremity and corresponding cervical paraspinal musculature." Dr. Johnson, who conducted the test, noted that the test was "unrevealing for any neurologic compromise of the peripheral nervous system," and that Moberg's history "suggests possible radicular involvement, which may be purely sensory in nature accounting for the negative study."

     *    On 9/3/09, a cervical MRI showed "[p]robable small focal central disc protrusion at C4-5 compressing the thecal[9] sac and probably compressing on the spinal cord in the midline and slightly to the left of midline" and "[m]inimal diffuse disc bulging at C5-6 and C6-7 but minimal if any central canal stenosis or neural foraminal[10] encroachment results."

---

     [7] A Babinski sign is "extension of the great toe and abduction of the other toes instead of the normal flexion reflex to plantar stimulation, considered indicative of corticospinal tract involvement ('positive' Babinski)." Stedman's Medical Dictionary, 28th Ed.

     [8] An electromyelogram, a "graphic representation of the electric currents associated with muscular action." Stedman's Medical Dictionary, 28th Ed.

     [9] "Thecal" refers to a sheath, "especially a tendon sheath." Stedman's Medical Dictionary, 28th Ed.

     [10] A foramen is "[a]n aperture or perforation through a bone or a membranous structure." Stedman's Medical Dictionary, 28th Ed.

Lumbar MRI this date showed "[d]isc degeneration at multiple lumbar levels with minimal diffuse disc bulging throughout all lumbar levels but minimal if any central canal stenosis or neural foraminal encroachment identified . . . ."

\* On 10/20/09 Dr. Randolph noted that Moberg's recent MRI showed "mild left C-6-7 neuroforaminal impingement," and that "[a]t the left at C-4-5 she's got neuroforaminal impingement as well from a small disc herniation."

\* On 10/29/09, Dr. Randolph assessed Moberg with left leg radiculopathy. This diagnosis appears to be based on Moberg's report of "back pain that radiates down her left side occasionally essentially in the S-1 dermatomal distribution."[11] Moberg had normal strength in her legs; a "downgoing" Babinski; could heel and toe walk; had normal gait; and had "a negative Romberg."[12]

\* On 4/23/10 Dr. Brock Schnebel, another of Moberg's treating orthopedists, noted that Moberg had normal strength and symmetric reflexes, no hyperreflexia[13] or clonus[14], and a negative

---

[11] A dermatome is "[t]he area of skin supplied by cutaneous branches of a single cranial or spinal nerve." Stedman's Medical Dictionary, 28th Ed.

[12] A positive sign would indicate "proprioception loss." Proprioception is "[a] sense or perception, usually at a subconscious level, of the movements and position of the body and especially its limbs, independent of vision; this sense is gained primarily from input from sensory nerve terminals in muscles and tendons (muscle spindles) and the fibrous capsule of joints combined with input from the vestibular apparatus." Stedman's Medical Dictionary, 28th Ed.

[13] "Exaggeration of the deep tendon reflexes." Stedman's Medical Dictionary, 28th Ed.

[14] "A form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession." Stedman's Medical Dictionary, 28th Ed.

-12-

Hoffmann's.

* On 5/7/10, Physical Therapist Dave Hill noted "lower extremity strength 4/5."

* 6/3/10 visit, Dr. Schnebel noted "I cannot pick up reflex or motor deficits upper or lower extremities. No clonus and Hoffmann's[15] is negative."

* On 8/10/10, Dr. Jared Ennis, a specialist in the treatment of pain, reported that Moberg had "dermatomal tactile changes consistent with L5 and S1 radiculitis." Muscle strength and function in both legs was "appropriate."

* On 10/28/10, a cervical MRI showed a midline disc protrusion at C4-C5 with "minimal spondylosis with no significant neural impingement or AP narrowing of the canal," and no neural foraminal narrowing or significant neural impingement at any level.

* On 11/2/10, a lumbar MRI showed degenerative changes, scoliosis, and several cysts, but no disc herniations or neural foraminal narrowing at L4-L5 or L5-S1. Moberg saw Dr. James Blankenship, a neurosurgeon, this date, complaining of right shoulder, arm, back, and leg pain. He noted that there was no evidence of significant neural impingement on her MRIs.

* On 1/4/11, Moberg saw Dr. Michael Morse, a neurologist,

---

[15] "[F]lexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked." Stedman's Medical Dictionary, 28th Ed.

who noted that he had reviewed her cervical MRI, which showed "multilevel degenerative changes, but no significant neural element compromise." He also reviewed the lumbar MRI, which showed "some degenerative changes without focal neural element compromise." Nerve conduction velocity tests done by Dr. Morse on Moberg's right arm this date were normal.

     * On 1/18/11, Moberg saw Dr. Randolph, who stated that she had "C-5-6 disc herniation but with mild to moderate neuroforaminal narrowing." He found "intact light touch sensation C-2 to T-2," and negative Babinski and Romberg signs.

     * On 1/28/11, a cervical x-ray showed "no evidence of significant neuroforaminal encroachment with the exception on the left at what is defined as 5-6, and this being only mild."

     * On 2/23/11, Dr. Luke Knox, an orthopedist, diagnosed both cervical and lumbar radiculopathy, with a positive Spurling's maneuver[16] in the left arm. All other tests that might have produced objective evidence of nerve pathology were negative.

     * On 3/8/11, Moberg saw Dr. Morse. She had had another cervical MRI that showed degenerative changes, but Dr. Morse did not note any evidence of radiculopathy.

     12. When the Court weighs the foregoing evidence, it finds

---

[16] The Spurling test is "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." (www.medilexicon.com.)

that there is some objective evidence of radiculopathy, but not very much. The amount might fairly be characterized as "more than a scintilla but less than a preponderance." Thus, were the issue whether the Plan was justified in relying on this evidence to find radiculopathy, existing case law would dictate a decision to that effect.

Here, however, the issue is whether Moberg can overturn the Plan's decision based on that quantum of evidence. The Court does not believe that the case law will support such a result. The evidence on the other side of the equation is too heavy:

* The "little bit of weakness" in the left arm and hand found by Dr. Randolph on 7/14/09 and the probable compression of the spinal cord found on 9/3/09 MRI are outweighed by the fact that there was no muscle wasting in the left arm, and that the EMG on 7/20/09 was normal.

* The neuroforaminal impingement at C4-C5 and C6-C7 found by Dr. Randolph on 10/20/09 is outweighed by Dr. Schnebel's report of no reflex or motor deficits in the arms on 6/3/10 and the 10/28/10 MRI showing no significant foraminal narrowing or neural impingement at any level.

* The "mild to moderate neuroforaminal narrowing" found by Dr. Randolph on 1/18/11 was described as "only mild" on 1/28/11.

* The positive Spurling test of 2/23/11 is outweighed by the cervical MRI of 3/8/11 which showed no evidence of

-15-

radiculopathy.

   *   The tactile sensations in the left leg found by Dr. Randolph on 10/29/09 and 8/10/10 are outweighed by findings of normal leg strength, and by the fact that on 6/3/10, Dr. Schnebel could not "pick up reflex or motor deficits" in the legs.

   On balance, when all the evidence in the AR is considered, the Court finds that more than a scintilla of evidence exists to support the decision to terminate Moberg's LTD benefits, and that a reasonable person could have reached the same decision as the Plan did.  This is especially so when one considers that the Plan consulted two physicians who supported its decision[17], and that none of Moberg's treating physicians contradicted those consultant physicians when offered the opportunity to do so.

   All this is not to downplay Moberg's very real physical problems.  The Court does not disagree with Moberg's assertions that she "has serious medical issues in her neck and back with radicular symptoms that affect her ability to work."  But the Plan has not contracted to cover this condition beyond 24 months unless there is "objective clinical evidence of nerve pathology."

   _____

   [17]   In the first appeal, the Plan relied on Dr. J. Collins, a specialist in occupational and environmental medicine, who opined  that "there are no exam findings consistent with lumbar or cervical radiculopathy" (emphasis in original).
      In the second appeal, MetLife relied on Dr. Ira Weisberg, also a specialist in occupational medicine, who stated that "[t]he diagnosis of radiculopathy is symptom-based only."  Dr. Weisberg noted that Moberg's treating physicians "had essentially normal or near normal objective findings on their physical exams, such as deep tendon reflexes muscle strength except the some [sic] sensory exam which were self-reported as being less than normal."

Because what little evidence there is of such pathology is insufficient to overcome the deference due to the Plan on appeal, its decision will be affirmed.

**IT IS THEREFORE ORDERED** that the decision of the Plan to terminate LTD benefits to Kelly Moberg as of March 10, 2010, is **affirmed.**

**IT IS SO ORDERED.**

        /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**